JURY DEMAND

IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF TEXAS DALLAS DIVISION

| | | |
|---|---|---|
| JASON CAGLE,<br><br>Plaintiff,<br><br>v.<br><br>UNITED SURGICAL PARTNERS INTERNATIONAL, INC., and USPI HOLDING COMPANY, INC.,<br><br>Defendants. | § § § § § § § § § § § § § § § | Civil Case No. **3:20-cv-01681-BN** |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff Jason Cagle (hereinafter "Plaintiff" or "Cagle") files his First Amended Complaint against Defendants United Surgical Partners International, Inc. (hereinafter, "USPI") and USPI Holding Company, Inc. (hereinafter, "USPI Holding") (hereinafter collectively, "Defendants," "You," or the "Company") seeking relief for retaliation under the Sarbanes-Oxley Act of 2002, breach of contract, and tortious interference with contract (hereinafter the "Complaint"). Plaintiff pleads as follows:

**SUMMARY**

1. Plaintiff brings causes of action under the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act") against Plaintiff's former employer USPI, for unlawful termination from Plaintiff's position as Chief Financial Officer because Plaintiff objected to, opposed, and provided

information about conduct that Plaintiff reasonably believed constituted violations of a "law, rule or regulation," of the United States Securities and Exchange Commission ("SEC") and other provisions of federal and state law relating to fraud upon shareholders.

2. Plaintiff also brings causes of action for breach of contract against Defendants and, alternatively, tortious interference with contract against USPI, related to certain stock option agreements that were awarded to Plaintiff.

3. Plaintiff further brings a cause of action against USPI for breach of Plaintiff's employment agreement.

4. Plaintiff seeks to recover damages, including without limitation the true value of Plaintiff's equity that Defendants wrongfully forfeited, back pay, front pay, compensatory damages, including expectation damages related to the contracts that were breached, and all other relief to make Plaintiff whole, including reasonable attorney's fees and costs incurred as a result of Defendants' unlawful misconduct.

5. Plaintiff is an individual who is a former employee of USPI. At the time Plaintiff was fired, he was the Chief Financial Officer. Plaintiff had been a top performer for USPI for 18 years (16 as an employee; and 2 years prior as outside counsel).

6. Plaintiff raised concerns about how Tenet Healthcare Corporation (hereinafter, "Tenet") was reporting/showing its huge financial obligations to fund USPI's employee equity plan. Soon after Plaintiff raised those reporting concerns USPI fired Plaintiff.

## PARTIES AND SERVICE

7. Plaintiff is an individual who is a resident of the State of Texas residing in Dallas County, Texas and was an employee of USPI working in Dallas County.

8. USPI is a Delaware corporation whose principal place of business and headquarters is located at 14201 Dallas Pkwy in Dallas, Dallas County Texas. USPI has already made its appearance in this lawsuit.

9. USPI Holding is headquartered in Framers Branch, Texas, and incorporated in Delaware. USPI Holding may be served through its registered agent, the Corporation Trust Company, which is located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## JURISDICTION AND VENUE

10. Prior to and at the time of Plaintiff's termination, USPI was and is a subsidiary of Tenet a publicly traded corporation with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C § 78l), and filed reports required by Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)). Prior to and at the time USPI fired Plaintiff, USPI's financial information was included in the consolidated financial statements of Tenet. USPI was, therefore, subject to the provisions of Sarbanes-Oxley Act.

11. This Court has jurisdiction over Plaintiff's claim under the Sarbanes-Oxley Act because that Act authorizes court actions by private parties who allege discharge or other discrimination in violation of 18 U.S.C. § 1514A in the appropriate district court of the United States without regard to the amount in controversy if the Secretary has not issued a final decision within 180 days of filing an administrative complaint.

12. On or about October 31, 2019, Plaintiff timely filed an administrative complaint with the United States Department of Labor.

13. The Secretary of Labor had not issued a final decision within 180 days of the filing of Plaintiff's Original Complaint in this action.

14. Plaintiff, within seven days after filing his Original Complaint, filed with OSHA a copy of the file-stamped Original Complaint. A copy of the Original Complaint was also served on the OSHA official, if any, who issued findings and/or preliminary order, the Assistant Secretary, and the Associate Solicitor, Division of Fair labor Standards, U.S. Department of Labor.

15. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the Sarbanes-Oxley Act, laws of the United States, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the subject matter of Plaintiff's state law breach of contract and tortious interference causes of action that are so related to and form the same case or controversy as Plaintiff's claims under the Sarbanes-Oxley Act.

16. Venue for this action lies properly in the United States District Court for the Northern District of Texas, Dallas Division, pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in Dallas County, which is a county included within those assigned to the Dallas Division of the Northern District of Texas.

## FACTS

**Plaintiff's 18 Years of Dedicated Service to USPI**

17. Plaintiff started working for USPI in 2001. At the time, Plaintiff was a corporate and securities lawyer at Vinson & Elkins, UPSI's outside law firm. USPI was so confident in Plaintiff's abilities that USPI tasked Plaintiff with helping take USPI public. In 2003, USPI founders Don Steen and Bill Wilcox hired Plaintiff to become USPI's only in-house attorney.

18. In 2010, Plaintiff was promoted to Senior Vice President of Acquisitions, the second most senior person in development. Plaintiff was then promoted to Chief Financial Officer in January of 2013.

**Plaintiff Helps USPI Achieve Explosive Growth**

19. To say that Plaintiff had a productive career at USPI would be a massive understatement. Plaintiff's lengthy employment with USPI was marked by multiple promotions, substantial bonuses, and huge success/growth for the Company.

20. When Plaintiff first began working for USPI (as outside counsel) on USPI's IPO in 2001, USPI had only 44 facilities. By the time Tenet purchased USPI in March of 2015 (and Plaintiff had been working in various capacities for USPI for almost 14 years, including some of the highest-ranking positions in the Company—*e.g.*, CFO), USPI owned 244 ambulatory surgery centers and 16 short-stay hospitals--a staggering 500% increase in facilities owned and operated by USPI.

21. Plaintiff was instrumental in USPI's successful IPO, its $200 million sale of USPI's Spanish operations in 2005, USPI's $1.8 billion LBO, numerous acquisitions, and USPI's sale to Tenet. From the time Plaintiff joined USPI in 2003 through Plaintiff's tenure as Chief Financial Officer, USPI's EBITDA grew dramatically.

22. During much of this growth, Plaintiff was either USPI's sole in-house attorney or was assisted by just one other in-house lawyer.  Plaintiff ceased serving as USPI's lawyer in any material capacity in 2010, and in any capacity at all when Plaintiff was promoted to Chief Financial Officer in January of 2013.

**Tenet Pursues USPI**

23. At the same time USPI was experiencing rapid growth and success, Tenet's trajectory was on an opposite path.   Between 2003 and 2018, Tenet lost over $5 billion dollars and paid record fines to the Department of Justice, including fines of $745 million in 2006, $42.75 million in 2012,

and $514 million in 2016. Not surprisingly, Tenet faced takeover attempts and shareholder revolt. In an effort to stop its serious financial losses, Tenet pursued a number of acquisitions in the 2014-2015 timeframe, including USPI.

24. When Tenet approached USPI, USPI's owners and executive team, including Plaintiff, had worked tirelessly for close to two decades to build USPI into a successful and highly profitable entity.

25. Tenet was unable to give a full cash payment for the enterprise value of USPI, so the transaction occurred in stages from 2015 through 2018.

26. In addition, USPI's management team was only willing to support the transaction if there was an equity compensation plan for USPI employees based solely on USPI's performance.  USPI's management team knew Tenet's operating prospects and profitability were low, wanted to protect its employees and was leery of Tenet's bad reputation.  USPI knew that to retain the dedicated employees who had built USPI, an equity plan that isolated USPI's performance was necessary. Tenet agreed.

27. Given their justified concerns about Tenet's poor reputation and operating instability, USPI's ownership informed Tenet that USPI would consider selling to Tenet only if the deal included an equity plan that provided USPI's management team and approximately 100 key employees, with 10% of the upside in USPI's earnings over a seven-year period. Thus, the USPI 2015 Equity Management Plan (the "Equity Plan") was born.

28. This plan was designed to be sure that Tenet could not use a classic private equity tactic to cut expenses to the bone and replace the existing executives and employees.  The plan was for USPI to induce the USPI team, including Plaintiff, to stay in place in exchange for receiving full and fair compensation for the value they built and would continue to build in USPI (through the

Equity Plan).

29. Tenet was told that without the Equity Plan, the transaction would not occur. In addition, the two respective CEOs agreed on the terms of USPI's independence, as full integration would have been unacceptable to USPI.

30. Tenet agreed to USPI's terms, and by 2018, it had acquired 95% of USPI's stock.

31. Plaintiff was granted more than 750,000 stock options under the Equity Plan through Stock Option Agreements that were entered into with Plaintiff.

32. In or around 2016, KPMG was retained to value the Company. Through 2019, KPMG determined the Company's fair market value using a consistent valuation method twice a year in the normal course of the Company's business. USPI's Compensation Committee ratified KPMG's valuations of the Company and adopted the same price that KPMG assigned to the Company to set the exercise prices of subsequently issued stock options during that time. The Company also publicized the KPMG valuations to the Plan participants to encourage their continued employment.

33. Using KPMG's conservative valuation (which was approved by the Company), the stock options awarded to Plaintiff under the Equity Plan will be worth more than $50 million by 2022.

34. Since the Plan started in 2015, the Company has been one of Tenet's most successful business operations. However, upon information and belief, the Company and Tenet (under the direction of Tenet's CEO Ron Rittenmeyer and others) hatched a scheme to intentionally devalue the Company and the shares awarded to Plan participants. Barclays was hired to value USPI using a revised valuation method designed to cut the Company's value – thereby reducing the amount Tenet/USPI would have to pay out to Plan participants. When Barclays failed to deliver a sufficient devaluation of the Company, the Compensation Committee further slashed the Company's value and acted in bad faith by (i) applying an arbitrary value of $34.13/share of the Company's stock,

and (ii) terminating the Equity Plan early for the purpose of depriving the Plan participants of the true and full value of the options they had been promised and issued.

35. Given the $46.11 fair market valuation that was placed on the Company's stock as of December 1, 2018, by KPMG (and the successful performance of the Company since then), there is no basis for the intentionally undervalued stock price of $34.13 per share other than a blatant scheme to deprive Plan participants of the true value of their options.

36. Other key executives and employees were granted similar stock options worth well in excess of $500 million, as valued by KPMG. This valuable Equity Plan was a huge liability that Tenet <u>should</u> have been carrying on its books. When Plaintiff reported that this significant liability was not being appropriately reported on "the books," the Company and Tenet retaliated.

**Plaintiff Raises Reporting and Disclosure Concerns**

37. In approximately November of 2018, around the same time the wheels were in motion on Tenet's/the Company's scheme to intentionally undervalue the stock options awarded under the Plan, Plaintiff became concerned that the potential value of the Equity Plan (and USPI's/Tenet's corresponding – and potentially enormous – liability for same) had not been publicly disclosed by Tenet in its financial disclosures, which was a material disclosure given Tenet's market capitalization. Plaintiff was also concerned that Tenet's failure to disclose was a potential violation by Tenet of the Sarbanes Oxley Act and/or other securities laws.

38. Plaintiff became focused on and concerned with this issue because, around that same time, Plan participants were discussing exercising their options and Plaintiff realized/feared that the Company and Tenet would not be able to cover the significant liability in cash (which was a liability, according to the valuations and projections performed by KPMG, that could exceed $650 million by 2022) and, instead, Tenet would need to conduct a shareholder vote to issue the

necessary stock to settle the liability.

39. In approximately November 2018, Plaintiff complained about Tenet's reporting in person with USPI's Chief Executive Officer, Bill Wilcox. Plaintiff complained about and notified Wilcox of his concern that Tenet would be unable to satisfy the Equity Plan as written and the issues related to Tenet's financial reporting of the Plan (and Plaintiff's belief that such failure to disclose may constitute a violation of the Sarbanes Oxley Act and/or other securities laws).  Wilcox told Plaintiff to address Plaintiff's concerns over the issue with Tenet's Chief Financial Officer (Dan Cancelmi).  Plaintiff did so, but Tenet did not fully or properly disclose this material information.

40. Instead, after Plaintiff complained, Tenet merely disclosed the book value of the Plan of its wholly owned subsidiary in its 2018 10-K, but did <u>not</u> disclose the amounts Tenet would actually have to pay--as Plaintiff recommended because that was material information. Plaintiff continued to have concerns with and complained about Tenet's lack of transparency and refusal to provide full disclosure to stockholders and potential investors.

41. In April 2019, it became clear to Plaintiff that Tenet's lack of transparency had become even more material and required disclosure to the stockholders and potential investors. Therefore, on or about April 26, 2019 (shortly before USPI wrongfully terminated Plaintiff), Plaintiff again blew the whistle regarding Tenet's improper financial reporting related to the Equity Plan during a meeting with Brett Brodnax (the current CEO of USPI) after an earnings call rehearsal.

42. On or about April 27, 2019, Plaintiff received a call from Audrey Andrews (Tenet's General Counsel). Andrews informed Plaintiff that Tenet had opened an investigation regarding Plaintiff's reporting to determine whether Tenet should amend its financial filings, delay the next filing and earnings call, and/or take other potential actions in response to Plaintiff's reporting of potential violations by Tenet of SOX and/or other securities laws. Andrews asked Plaintiff to meet

with lawyers from Willkie Farr & Gallagher LLP ("WFG") regarding Plaintiff's reporting and the investigation of same.

43. On or about April 28, 2019, Plaintiff spoke with various WFG lawyers. Plaintiff informed the lawyers that he had raised the disclosure issue with the appropriate individuals as far back as November 2018.

44. On or about April 29, 2019, Plaintiff received a call from Andrews who informed Plaintiff that Tenet had concluded its "investigation" regarding Plaintiff's reporting and would make its financial filings with no additional disclosure. ***USPI fired Plaintiff the very next week***.

**USPI Retaliates**

45. On Friday evening of May 3, 16+ years after Plaintiff was hired by USPI, CEO Brett Brodnax told Plaintiff that he believed there were grounds for "cause" termination under Plaintiff's Employment Agreement.  However, Brodnax told Plaintiff that if Plaintiff voluntarily resigned Plaintiff would receive a severance package with the same monetary terms as a "not for cause" termination under Plaintiff's Employment Agreement.  If Plaintiff did not voluntarily resign his employment, the Board of Directors had to vote on whether to terminate Plaintiff's employment. Plaintiff did not agree to voluntarily resign and awaited the Board of Director's action on Plaintiff's job status. On May 8, USPI's Board of Directors met and considered whether to fire Plaintiff. USPI's Board voted to terminate Plaintiff's employment.  On May 9, after the Board of Director's vote, the Company terminated Plaintiff's employment for "cause."  USPI's Board stated that the termination of Plaintiff's employment was for cause.  In reality, USPI terminated Plaintiff's employment in retaliation for Plaintiff reporting a Sarbanes Oxley Act violation.

**Contemporaneous Documents and Actions Prove Plaintiff's Firing was Retaliatory**

46. Plaintiff was fired in close proximity to the April 26 meeting where Plaintiff blew the whistle again on Tenet's improper financial reporting.

47. Prior to Plaintiff's firing, USPI had not "written up" Plaintiff, given Plaintiff a bad review, sent Plaintiff written warnings, or put Plaintiff on probation or a performance improvement plan. Quite the contrary, Plaintiff had received nothing but good reviews, multiple promotions, big raises and big bonuses. It was only *after* Plaintiff blew the whistle on the financial reporting issues that Plaintiff was summarily fired without any prior warning. If Plaintiff truly had willfully failed to perform Plaintiff's job duties, one would think USPI would have sent Plaintiff several written warnings. Yet, not even one warning was sent!

**USPI Did not have "Cause" to Fire Plaintiff**

48. USPI fired Plaintiff on May 9, 2019. USPI's termination letter says that Plaintiff was being fired for "willful and continued failure to perform Plaintiff's material duties." But no contemporaneous evidence indicates Plaintiff ever willfully refused to perform any of his material duties or that cause existed to fire Plaintiff.

**USPI Hides the Ball**

49. Before filing this lawsuit, Plaintiff asked USPI to disclose the minutes of the Board Meeting where the Board met to decide whether or not to fire Plaintiff. USPI refused to disclose the minutes of said meeting, and Plaintiff was forced to obtain same through discovery in this lawsuit. Once again, the lack of transparency by USPI and Tenet speaks volumes. If Plaintiff's firing was legitimate, there would have been no reason not to disclose the Board's minutes before this lawsuit was filed.

## CAUSE OF ACTION: SARBANES-OXLEY
## WHISTLEBLOWER PROTECTION - 18 U.S.C. § 1514A – AGAINST USPI

50. Plaintiff incorporates by reference and realleges each allegation in this First Amended Complaint.

51. The Sarbanes-Oxley Act, 18 U.S.C. § 1514A, prohibits any company with a class of securities registered under § 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), or that is required to file reports under §15(d) of the same Act (15 U.S.C. § 78o (d)), including any subsidiary or affiliate whose financial information is included in the consolidated financial statement of such company, or any officer, employee or agent of such company, from discharging, harassing, or in any manner discriminating against an employee in the terms and conditions of employment because the employee provided information relating to alleged violations of 18 U.S.C. §§ 1341, 1343, 1344 or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of federal law relating to fraud against shareholders.

52. Before and at the time of Plaintiff's termination, USPI was a subsidiary of Tenet, a publicly traded company with a class of securities registered under § 12 of the Securities Exchange Act and USPI's financial information is included in the consolidated financial statements of Tenet. USPI is therefore subject to the Sarbanes-Oxley Act.

53. Plaintiff engaged in protected activities as defined in 18 U.S.C. §1514A by providing information to persons with supervisory authority over Plaintiff (or such other person working for the employer who has supervisory authority to investigate, discover, or terminate misconduct) regarding the fraudulent reporting of USPI's equity plan, which Plaintiff reasonably believed constituted violations of 18 U.S.C. §§ 1341, 1343, 1344 or 1348, various rules and regulations

of the Securities and Exchange Commission, and provisions of federal law relating to fraud against shareholders (*i.e.*, Plaintiff engaged in protected whistleblowing activity).

54. As described herein, USPI knew that Plaintiff engaged in the protected whistleblowing activity.

55. Moreover, as a result of Plaintiff's protected activities under the Act, Plaintiff was unlawfully retaliated against and ultimately fired by USPI in retaliation, adverse employment actions prohibited by the Act.

56. Under 18 U.S.C. § 1514A(c), Plaintiff is entitled to all relief necessary to make him whole, which includes, but is not limited to, the enormous true value of all the options that were issued to Plaintiff under the Award Agreements and wrongfully forfeited, which – according to KPMG's conservative approach (which was approved by the Company) – exceeds $50 million (when USPI is not afforded the benefit of the bad faith devaluation of the Company's stock and early termination of the Plan, which both occurred after USPI wrongfully terminated Plaintiff and should be disregarded for purposes of calculating Plaintiff's damages). Plaintiff is also entitled to reinstatement pursuant to 18 U.S.C. § 1514A at the same seniority status that Plaintiff would have had, but for the discrimination. Plaintiff is further entitled to back pay with interest and compensation for all available special damages sustained as a result of the discrimination and retaliation, including litigation costs, expert witness fees, and reasonable attorney's fees.

## CAUSE OF ACTION: BREACH OF CONTRACT (DEFENDANTS) AND, ALTERNATIVELY, TORTIOUS INTERFERENCE (USPI) – AWARD AGREEMENTS

57. Plaintiff incorporates by reference and realleges each allegation in this First Amended Complaint.

58. Plaintiff's July 27, 2015 Stock Option Agreement, November 18, 2016 Stock Option Agreement, July 14, 2017, Stock Option Agreement, March 1, 2018 Stock Option Agreement and July 30, 2018 Stock Option Agreement with Defendants are valid and enforceable contracts (the "Award Agreements"). The Award Agreements expressly incorporate the Equity Plan and the terms and conditions of the Equity Plan.

59. Plaintiff performed, tendered performance of, or was excused from performing Plaintiff's contractual obligations under the Award Agreements.

60. Defendants breached the Award Agreements by, among other things, failing to allow Plaintiff to exercise all of his options under the Award Agreements, and by repudiating and forfeiting options under the Award Agreements. Defendants also acted in bad faith and in contravention of the terms of the Award Agreements (which incorporate the terms of the Equity Plan) when they intentionally devalued the Company's stock and terminated the Equity Plan early for the purpose of depriving the Plan participants of the true and full value of the options they had been promised and issued. Moreover, Defendants made certain conditions under the Award Agreements impossible by wrongfully terminating Plaintiff's employment.

61. Failure to allow the exercise of these options, making conditions impossible, and by repudiating Plaintiff's right to same, has caused Plaintiff significant damages. Plaintiff is entitled to and demands all expectation damages under the Award Agreements (which includes, but is not limited to, the enormous true value of all the options that were issued to Plaintiff under the Award Agreements – *i.e.*, more than $50 million pursuant to the valuation that was paid for

and approved by the Company). Plaintiff further demands all other damages that are available to him for breach of the Award Agreements, including an award of reasonable attorney's fees and other litigation expenses and costs.

62. Pleading in the alternative, if Defendants contend that USPI is not a party to the Award Agreements (and, instead, is a "stranger to the contract"), USPI tortiously interfered with the Award Agreements and is liable to Plaintiff for such wrongful conduct.

63. Specifically, USPI was aware of the existence of the Award Agreements (*i.e.*, valid contracts subject to interference). USPI willfully and intentionally interfered with such contracts by retaliating against and wrongfully terminating Plaintiff. USPI's interference proximately caused actual and significant damages or loss to Plaintiff (*i.e.*, the loss of the true and full value of the extremely valuable options that were awarded to Plaintiff under the Award Agreements).

64. As a result of USPI's tortious interference, Plaintiff is entitled to and seeks judgment against USPI for all of Plaintiff's expectation damages under the Award Agreements (which includes, but is not limited to, the enormous true and full value of all the options that were issued to Plaintiff under the Award Agreements).

65. Plaintiff also seeks an award of punitive or exemplary damages (in an amount to be determined by the trier of fact) because Defendants acted with willful intent and actual malice in retaliating against Plaintiff, breaching the Award Agreements, and/or interfering with Plaintiff's rights to exercise his options under the Award Agreements

## ALTERNATIVE CAUSE OF ACTION:
## BREACH OF CONTRACT -- EMPLOYMENT AGREEMENT (USPI)

66. Plaintiff incorporates by reference and realleges each allegation in this First Amended Complaint.

67. In the alternative, if Plaintiff is not awarded relief under Sarbanes Oxley Act, then Plaintiff brings a claim for breach of his Employment Agreement's severance provision.

68. Plaintiff's Second Amended and Restated Employment Agreement ("Employment Agreement") with USPI is a valid and enforceable contract.

69. Plaintiff performed, tendered performance of, or was excused from performing Plaintiff's contractual obligations under the Employment Agreement.

70. Pleading in the alternative, to the extent necessary, USPI breached the Employment Agreement by, among other things, failing to pay the severance obligations thereunder, including: 12 months of Base Pay; continuation of health insurance for 12 months; 2019 bonus (i, ii and iii collectively, "Severance Amounts").

71. Failure to pay to pay the Severance Amounts has caused Plaintiff significant damages.

72. Plaintiff requests the Court award Plaintiff the Severance Amounts.

## JURY DEMAND

73. Plaintiff hereby demands a trial by jury of all issues so triable by applicable law, including but not limited to Federal Rule of Civil Procedure 38.

## CONDITIONS PRECEDENT

74. All conditions precedent to all relief being sought by Plaintiff have been met, performed, occurred, and/or waived.

## RESERVATION OF RIGHTS

75. The right to bring additional causes of action and to amend this Complaint, as necessary, is specifically reserved.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that this Court enter a judgment in favor of Plaintiff Cagle against Defendants as follows:

A. Order that Plaintiff be reinstated or constructively reinstated to Plaintiff's former position, with the same seniority status that Plaintiff would have had but for the discrimination and enjoin the Defendants from further retaliation against Plaintiff;

B. Award Plaintiff all back pay and benefits, including salary increases, bonuses, stock options, vacation pay and health insurance;

C. Award Plaintiff front pay and reputational damages in an amount to be proved at trial, to compensate Plaintiff for the loss of income and earning capacity that Defendants' conduct has caused;

D. Award Plaintiff money damages for the emotional distress caused by Defendants' unlawful actions;

E. Award Plaintiff the true and full value of all of the options issued to Plaintiff under the Award Agreements that would have vested as of the date of this Court's judgment or reinstatement if Defendants had not engaged in the wrongful conduct outlined herein;

F. Award Plaintiff all expectation damages under the Award Agreements and any other available damages resulting from the breach of the Award Agreements;

G. Pre-judgment interest at the highest rate allowed by law:

H. Post-judgment interest at the highest rate allowed by law;

I. Reasonable attorneys' fees and expert witness fees;

J. Any punitive or exemplary damages that are available,

K. Costs of court; and

L. Such other and further relief, whether at law or in equity, to which Plaintiff shows Plaintiff is entitled.

Respectfully submitted,

*/s/ Rogge Dunn*
**ROGGE DUNN**
State Bar No. 06249500

E-Mail: dunn@righttowork.com

**CHASE J. POTTER**
State Bar No. 24088245
E-Mail: potter@roggedunngroup.com

**A. DAVID GROSS**
State Bar No. 08531200
E-Mail: gross@roggedunngroup.com

ROGGE DUNN GROUP, PC
500 N. Akard Street, Suite 1900
Dallas, Texas 75201
Telephone: (214) 888-5000
Facsimile: (214) 220-3833

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2021, I electronically transmitted the attached document to all counsel of record via the Court's ECF system.

*/s/ Chase J. Potter*
**ROGGE DUNN**
**CHASE J. POTTER**